IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARIA P.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 21 C 0132 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§416(I), 423, in February of 2019. (Administrative Record (R.) 159-65). She claimed that she has been disabled since April 3, 2018, due to a back injury. (R. 159, 189). Over the next year and a half, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on January 8, 2021. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on January 13, 2021. [Dkt. #5]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

I.

A.

Plaintiff was born on December 15, 1973, making her 46 years old when the ALJ found her not disabled. (R. 18-35, 159). She has an excellent work record, having worked steadily from 1992 through 2019. (R. 178-179). All those years, she toiled as a janitor, cleaning offices, collecting trash, washing floors, cleaning restrooms. (R. 192). The job ended when she injured her back at work. (R. 46-47). The pain radiates down her left leg. (R. 53). She was unable to do housework and it interfered with her sleep. (R. 54). It bothered her sitting and standing, and she had to switch positions after about 30–45 minutes. (R. 56).

Treatment has involved pain medication, physical therapy, and injections. After her second injection, she lost feeling in her leg and fell down the stairs and fractured her leg. (R. 56-57). After that incident, she was afraid to have surgery. (R. 58-59). She was afraid something similar might happen and she wouldn't be able to walk any more. (R. 59).

On July 27, 2017, plaintiff sought treatment with her treating physician, Dr. Ortega, for left shoulder pain that radiated down her left arm, and left leg pain. (R. 291, 292). Physical exam was normal. (R. 293). Dr. Ortega noted plaintiff's work involved a lot of lifting. (R. 292). Her diagnosis was musculoskeletal strain and she recommended a heating pad and ibuprofen. (R. 293).

On September 1, 2017, plaintiff cut her foot on a piece of glass at work. (R. 294, 295). She was experiencing pain in her right heel and palpation of the area showed there was something present. (R. 295, 296). Plaintiff was sent to the emergency room (R. 295), and x-rays revealed a small plantar heel spur. (R. 353, 901).

On April 3, 2018, plaintiff injured her back while lifting a full garbage can, weighing about 50 pounds. (R. 199). She saw her primary care physician the next day, complaining of left hip and left lower back pain, sometimes radiating down to her left knee area. (R. 297, 298). She rated her pain as 8-9/10. (R. 297). Upon physical examination, it was noted that the left lower paraspinal lumbar muscle was tender, as well as her left mid-gluteal area. Straight leg raise was positive at 20 degrees and gait was antalgic. (R. 299). On April 4, 2018, hip x-rays showed mild arthritic changes in the both sacroiliac joints. (R. 354). Plaintiff was prescribed physical therapy and medication. (R. 299-300).

A week later, plaintiff was back, complaining of lumber spine pain on the left side radiating down her left leg. (R. 301). She had her first physical therapy session that day. (R. 301). Pain was exacerbated by prolonged sitting, standing and walking, and Ibuprofen was not helping. (R. 301). On physical exam, Dr. Agnieszka Brukasz noted that plaintiff was obese and in pain (R. 301), with tenderness on the left of her paralumbar spine and buttocks. Range of motion was decreased and, again, straight leg raise and crossed straight leg raise were positive. (R.302).

On May 2, 2018, plaintiff returned with continuing complaints of pain in her lumbar spine region, worse on the left, and pain shooting down her left leg. (R.304). She was having a difficult time ambulating and noticed that prolonged immobilization exacerbated the pain. (R.304). Physical therapy improved the pain only somewhat. (R.304). Dr. Brukasz's physical exam showed plaintiff to be obese, tenderness in the paralumbar and buttocks regions on the left greater than the right, decreased range of motion, and positive straight leg raise and crossed straight leg raise. (R.305). Blood work indicated microcytic hypochromic anemia and vitamin D deficiency. (R.305).

On May 24, 2018, plaintiff reported that physical therapy was improving her pain by 30-40%, but it became worse with light house chores, prolonged immobilization, and bending. (R.310). Plaintiff had been taking Ibuprofen on a regular basis for her pain. (R.310). Dr. Brukasz's physical exam noted paralumbar tenderness, buttocks tenderness, decreased range of motion, and positive tests for straight leg raise, crossed straight leg raise. (R. 310-312). On June 9, 2018, plaintiff underwent an MRI of her lumbar spine which showed: "moderate size left dorsolateral disc herniation causing severe asymmetric left lateral recess stenosis with displacement of possible compression of the exiting left S1 nerve roots" (R. 355) and "benign-appearing probable small hemangioma in the left sacral alum" (R. 356). Examination was essentially the same through July 19, 2018. (R. 317-318, 320-321, 324-325).

In August 2018, plaintiff began seeing not only her primary care physician, Dr. Brukasz, for her back pain, but also Orthopedic and Pain specialists. (R.327). "Any prolonged house work exacerbated her pain." (R.327). After spending the day cleaning the floor at home, she was up all night in pain. (R. 327). Plaintiff still had paralumbar and buttock tenderness, but now also had midline spinal tenderness; range of motion was decreased for extension only, and straight leg raise triggered pain in the lumbar spine region on the left side. (R.328). Physical exams on September 19, 2018 (R.329-330) and November 14, 2018 (R.336-337) were much the same.

On December 14, 2018, plaintiff again sought treatment for pain in the lumbar spine region that radiated down her left leg. (R. 338). There was, again, tenderness in the paralumbar and buttock regions. (R.339). Straight leg raise was once again positive, at 90 degrees. (R.339). Examinations on January 16, 2019 (R.342-344) and February 14, 2019 (R.345-346) showed no improvement. Plaintiff continued to complain and receive treatment for her back pain on May 13,

4

2019 (R.671), June 13, 2019 (R.1039-1040), June 18, 2019 (R.416), July 5, 2019 (R.446), July 30, 2019 (R.414), August12, 2019 (R.1042), September 3, 2019 (R.1049-1050), September 17, 2019 (R.412), October 1, 2019 (R.1054), October 29, 2019 (R.1060), October 31, 2019 (R.1063), November 19, 2019 (R.1054).

On March 20, 2019, plaintiff had her first epidural steroid injection. (R.370). She had a second injection on July 31, 2019. (R.384). Plaintiff was discharged from physical therapy on August 5, 2019, still experiencing pain in her lower back and left leg. (R. 423). She had the following functional limitations: "ascending stairs, bed mobility, bending, carrying, cleaning, vacuuming, sweeping, climbing ladder, descending stairs, dressing: donning/doffing shoes/socks, jogging/running, lifting from floor, lifting overhead, pulling/pushing tasks, sleeping greater than 6 hours, squatting, sustained sitting, sustained standing, twisting/turning/shoveling." (R.423).

Plaintiff received worker's compensation benefits as a result of her injury until about July 2019. (R.46). And so, she attempted to return to work at that time. (R.47). After about two weeks, she fell, fracturing her leg. (R. 47).

Shortly after her second steroid injection, plaintiff fell down the stairs and broke her right ankle. (R.411). Upon examination, her right foot was swollen; she reported pain of 9/10 and not being able to put weight on her foot. (R.1045). Diagnosis was a closed fracture of the right ankle. (R.1046). She was ordered to use a Cam walker and crutches. (R.1047). On September 9, 2019, plaintiff reported that her pain was less when walking and none while laying down; however, when standing her pain level would increase to 6-7/10. (R. 1051). X-rays showed "partial bridging of distal posterior tibial fracture and fracture of upper/medial malleolus" and "re-demonstration small chip fracture inferior to medial malleolus." (R.1086). On October 14, 2019, after the Cam boot was

removed, plaintiff noted she was walking funny. (R. 1056). On November 19, 2019, she reported that she had not been able to get her physical therapy in because her insurance was blocking it and refusing to pay for it. (R.1065). She was still in pain when walking. (R. 1065, 1068). Although plaintiff's November 20, 2019 x-ray showed that her medial malleolus and posterior tibia healed, there was still a tiny chip fracture. (R.1087).

**B.**

After a telephonic administrative hearing at which plaintiff, represented by counsel, testified through an interpreter, and a vocational expert testified, the ALJ determined the plaintiff had the following severe impairment: "degenerative disc disease of the lumbar spine." (R. 24). The ALJ found that plaintiff's other impairments, like osteoarthritis of the left hip and status post right ankle fracture, were not severe. (R. 24). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on listing 1.02 (major dysfunction of a joint) and listing 1.04(disorders of the spine). (R. 25).

The ALJ then determined that plaintiff could perform light work with the following limitations: occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no climbing ladders, ropes, or scaffolds; and no work around unprotected heights, open flames, or unprotected dangerous machinery. (R. 25). The ALJ then summarized plaintiff's allegations regarding her limitations and determined that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 26). The ALJ summarized the medical evidence and conceded that it provided some support for plaintiff's alleged limitations, but also evidence suggested she was not as limited as she claimed. (R. 26-27). The ALJ also found that plaintiff's activities "suggest[ed] that the [plaintiff's] physical functioning [wa]s not as limited as alleged and are consistent with an ability to perform light work." (R. 28).

As for medical opinions, the ALJ found the initial level opinion from the state agency reviewing physician that plaintiff's back impairment was non-severe was "unpersuasive." The ALJ felt it was inconsistent with the medical record as developed over time. (R. 28). The ALJ found the reconsideration level state agency physician opinion "persuasive" because it was supported by the medical record. The ALJ adopted much of it as her residual functional capacity finding, adding the restriction against climbing ladders, ropes or scaffolds, and working around hazards. (R. 28-29). The ALJ found the opinion of plaintiff's treating physician that she was limited to sedentary work unpersuasive because it was inconsistent with objective findings and seemed to be directed to plaintiff's worker's compensation claim. (R. 29).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could not perform her past relevant work as a janitor because it was medium work. (R. 29). She could, however perform other jobs that existed in significant numbers in the national economy: inspector ( DOT #641.687-014, SVP 2, light exertion, 382,000 jobs in the national economy); sorter (DOT #222.687-022, SVP 2, light exertion 55,000 jobs in the national economy); and assembler (DOT #06.687-010, SVP 2, light exertion, 51,000 jobs in the national economy). (R. 30). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 31).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. Schloesser v. Berryhill, 870 F.3d 712, 717 (7th Cir. 2017); *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997).

The substantial evidence standard is a low hurdle to negotiate. *Biestek* , 139 S. Ct. at 1154; *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). If reasonable minds could differ, the court must defer to the ALJ's weighing of the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result,

the case must be remanded if the ALJ fails in his or her obligation to build a "logical bridge." As *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) put it: "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."

Of course, this is a subjective standard, and the very subjectivity of the requirement makes it difficult for ALJs hoping to write decisions that stand up to judicial scrutiny when challenged. One reviewer might see an expanse of rushing water that can only be traversed by an engineering marvel like the Mackinac bridge. Another might see a shallow creek they can hop across on a rock or two. But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).

### III.

#### A.

As it happens, this is a "logical bridge" case in which there is a gap between the ALJ's conclusions and the evidence. As just stated, sometimes a sketchy opinion will allow the reviewing court to follow the ALJ's reasoning from the medical evidence to his RFC finding and conclusion that the plaintiff can still work. The reporters contain case after case in which medical records depict people, many young and unfamiliar with the demands of work, troubled by no more than what are found to be merely a couple of mild impairments. Records like those allow a court, without lengthy

9

explanation, to follow the reasoning of an ALJ, who finds such an individual able to work on a daily basis. In those cases, there is not much of a "bridge" needed to make it from one side to the other and review is not difficult. This is not one of those cases.

It is consistently said that the district court is charged with reading the ALJ's decision as a whole and taking a common sense approach. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). That, of course, cuts both ways. In this case, the ALJ considered some of the impairments plaintiff suffers from, didn't consider others, and didn't even mention one. As a result, she failed to do the math (figuratively) – or, at least, to "show her work" – on how all those impairments, from non-severe to severe combine to adversely affect plaintiff's ability to perform light work for 8 hours a day, 5 days a week.

The plaintiff is a 48-year-old woman who has worked faithfully for nearly 30 years in what the Commissioner would define as medium or heavy jobs. (R. 178-79). Almost three decades of such work inevitably takes its toll, and the body often tends to break down. The ALJ found plaintiff had one severe impairment: degenerative disc disease of the lumbar spine, which, in fact, involves a herniated disc. The ALJ found plaintiff had two non-severe impairments: – osteoarthritis of the left hip and status post fracture of the right ankle. She is also obese, which the ALJ did not mention. The ALJ also did not mention that she has a bone spur in her right heel. Despite all that, the ALJ found plaintiff could do light work. That means she has to be able to stand or walk for six hours a day and lift or carry up to 20 pounds, five days a week and 50 weeks a year, *Stage v. Colvin*, 812 F.3d 1121, 1124 (7th Cir. 2016). The ALJ also said plaintiff could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl up to one-third of every workday, five days a week, 50 weeks a year.

10

From a "common-sense" perspective, that certainly seems a stretch.

First, as the plaintiff points out, the ALJ did not adequately consider or improperly discounted a number of her impairments: osteoarthritis of the left hip, obesity, and chip fractures in her right ankle. Whether an ALJ finds an impairment to be severe or not, she must consider its effects in combination, with both severe impairments, and with other non-severe impairments. *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); SSR 96–8P, 1996 WL 374184 at *5 (when considered in combination with other impairments, a non-severe impairment may become "critical" to the outcome of a claim).

Obviously, obesity adversely affects the arthritis and herniated disc in plaintiff's back. And it would also impinge on standing and walking with even a mildly arthritic hip, and bone chips in an ankle and spurs in a heel. *See Allensworth v. Colvin*, 814 F.3d 831, 833 (7th Cir. 2016)(ALJ failed to consider how plaintiff's obesity could aggravate his back, knee and OSA [obstructive sleep apnea] impairments); *Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014)(obesity and a painful, malfunctioning hip and knee); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004)("A great many people who are not grossly obese and do not have arthritic knees find it distinctly uncomfortable to stand for two hours at a time."). But the ALJ didn't consider – or even mention – plaintiff's obesity anywhere in her opinion. This is remarkable, as doctor after doctor, treatment note after treatment note, refer to it as an impairment contributing to plaintiff's overall problems. (R. 276, 301, 305, 313, 320, 322, 327, 329, 333, 336, 338, 340, 343, 345, 346). *See Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir.2012) (noting that "[s]everal other physicians specifically discussed Arnett's obesity," and rebuking the ALJ's failure to mention those opinions). While ALJ's don't have to mention every piece of evidence, given the record, that is a whole line of critical evidence the ALJ

11

neglected.

As to the impairments the ALJ did mention, here is how she considered them in her RFC finding:

> Any limitation resulting from the claimant's lumbar impairment is adequately accommodated by the residual functional capacity, which restricts her to light work with reduced postural duties and reduced exposure to hazards. While the impairment of her ankle is found to be non-severe, ankle pain and low back pain are accommodated with the limitations to occasional climbing, stooping, kneeling, crouching and crawling. Further, to accommodate any issues with medication side effects, or with fatigue that might result from pain, she is restricted with respect to heights and hazards as set forth in the residual functional capacity finding.

(R.28). The ALJ seems to gloss over the fact that standing and walking for 6 hours a day would put quite a strain on a herniated disc, an arthritic hip, an ankle with bone chips, and a heel with a spur. Crawling and kneeling would seem to make matters much worse. And that's without putting obesity into the equation. As such, there is no "logical bridge" between the impairments the ALJ considered – and the ones she ignored – and the ALJ's residual functional capacity finding.

**B.**

Similarly, there is a disconnect between the plaintiff's statements regarding her daily activities and what the ALJ made of them. These are the activities the ALJ focused on:

> For instance, in July 2018, [plaintiff] reported working in her garden and in August 2018, she described spending time cleaning her floor at home. Likewise, in October 2018, she reported taking her son to soccer games and being able to tolerate the walking associated with this activity. In her March 2019 function report, she acknowledged being able to prepare simple meals, drive, and attend church on a regular basis. She also indicated that she had no difficulties performing personal care activities, including bathing and brushing her hair. At a medical appointment in June 2019, she stated that she could perform household chores for about an hour to one and one half hours. A few months later, in her October 2019 function report, she reported being able to care for a pet dog and perform household chores such as cleaning and ironing. She also indicated that she was able to travel to her sister's house and attend her son's soccer games on a regular basis. At a medical

12

>appointment during that same month, she similarly reported cooking and standing a lot while at home.

(R.27-28). The problem here is that the "ALJ ignored [plaintiff's] qualifications as to how [s]he carried out those activities . . . " *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). An ALJ cannot ignore that a plaintiff performs daily activities with significant limitations, with help, or with breaks to rest. *See Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021)(". . . the ALJ overlooked, or at least did not acknowledge and engage with, the limitations with those tasks that [plaintiff] included . . . [such as] her need for frequent breaks, and her dependence on her children for daily living activities (including shopping, personal hygiene, and caring for pets"); ; *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir.2009)("The ALJ here ignored [claimant's] numerous qualifications regarding her daily activities...."); *see also Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).

There is a reference to plaintiff doing garden work on July 14, 2018 (R.322), but plaintiff also explained that yard work is difficult for her, and that her husband does most of it. (R.222). When the plaintiff told her doctor that she had been cleaning the floor in August 2018, she added that, as a result, she was up all night with severe pain in her back. (R.327). That's doesn't bode well for her being able to stoop, kneel, crouch, and crawl up to one-third of every workday, which is what the ALJ said she could do. As for going to her son's soccer game, how much walking is "associated" with that? Certainly not up to six hours (as the ALJ found she could), not even if she walked the entire duration of the game.

Similarly, being able to prepare simple meals, drive, and attend church doesn't take much effort, and even then, the ALJ ignored the qualifications. Plaintiff only cooks for about 15-30

13

minutes, because she cannot stand for any length of time. (R. 201). Her husband and son help with laundry. (R.201). Going to church "regularly," as the ALJ put it, would be once a week, not every day like a job, and for a brief, finite time, almost all of which would be spent sitting and without any exertion. Moreover, the plaintiff, in fact, said she went to church only "occasionally." (R. 203). The ALJ also noted that plaintiff was able to care for her pet dog. But, at most that would involve putting out water or food for the dog, and taking it for a short walk. Significantly, plaintiff does not even manage that on her own. Her son and husband "mainly" take care of the dog. (R.200). Her household chores – cooking, ironing, laundry – all took longer than they once did as she had to rest in between. (R.221).

>All that is bad enough; but then the ALJ said:

>The undersigned recognizes that the claimant's described activities are not conclusive proof the claimant can perform full-time work and that such activities are just one factor to be considered by the administrative law judge in evaluating subjective complaints and symptoms and assessing the residual functional capacity. Nonetheless, *these activities* suggest that the claimant's physical functioning is not as limited as alleged and *are consistent with an ability to perform light work.*

(R. 28 (emphasis added)). In one breath, the ALJ acknowledged the long line of cases cautioning ALJs not to equate household chores and errands with the rigorous demands of the workplace. *See, e.g., Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010). But in the next, the ALJ says that plaintiff's activities "are consistent with an ability to perform light work." Case law aside, plaintiff's activities *as she described them* – and that is what the ALJ relied on – are not consistent with such an ability. Putting out a water dish, washing a floor only to be racked with pain until the next day, and going to mass once in a while are not consistent with the lifting, carrying, walking, and standing

14

required by even light work. *See, e.g., Gedatus v. Saul*, 994 F.3d 893, 897 (7th Cir. 2021). As the court emphasized in *Stage v. Colvin*, 812 F.3d 1121, 1124 (7th Cir. 2016), "[l]ight work, as defined by the agency, requires the ability to stand or walk for six hours a day, to lift or carry up to 20 pounds, to stoop and crouch, and occasionally to climb ramps or stairs." The ALJ's conclusion is at odds with basic concepts governing this and like cases.

In fact, without more from the ALJ, it is difficult to see how the plaintiff's activities – which, it bears repeating, she performs with significant limitations – support the ALJ's conclusion that they "suggest that [her] physical functioning is not as limited as alleged." For example, the ALJ recounted plaintiff's allegations as:

> She said that she has difficulty standing for long periods and must take breaks to sit down while performing housework due to back pain. When discussing her functional abilities, she estimated that she could stand for up to 30 minutes before needing to sit, and sit for 45 minutes before needing to stand up.

(R. 26). Contrary to the ALJ's reasoning, activities like cooking for 15-30 minutes, setting out food and water dishes, and doing laundry with help, are not inconsistent with the foregoing allegations. There is simply no "logical bridge" between the record evidence and the ALJ's conclusions.

The foregoing necessitates a remand; but one further observation about the ALJ's assessment of plaintiff' allegations needs to be made. The ALJ took plaintiff to task for alleging that she had to take naps during the day because, as the ALJ put it, there:

> is insufficient evidence in the record that such napping is medically necessary. Again, treatment notes do not document that the claimant's medical providers advised her to nap or rest for prolonged periods.

(R. 27). This, unfortunately, mischaracterizes or misapprehends the evidence. In fact, plaintiff testified that she didn't sleep through the night due to pain. She had to get up and do some walking

15

and standing. (R. 54-55). The ALJ then asked:

> Q: Do you have to take naps during the day?
>
> A: Yes. Yes, I do.
>
> Q: How many times do you take a nap during the day?
>
> A: Usually, like twice a day. When I watch TV, I just fall asleep.

(R. 55). The ALJ later asked her if a doctor ever told her to take naps, and the plaintiff clearly testified, "No, he didn't tell me to do that, but I feel so tired that I feel like I have to nap during the day." (R. 59). So, the plaintiff never said a doctor told her to take naps, and she never claimed she even asked a doctor if she should so what she said she had to do because she was so fatigued, and one would not expect her (or anyone else) to have asked a doctor for permission, as it were, to do that which she said necessity compelled. In short, the plaintiff did not lie about having to take naps, and her allegation is not "unfounded" as the ALJ put it.[2] What is "unfounded" and illogical is the ALJ's conclusion.

Given the foregoing, this is a case where the ALJ's reasons for disbelieving the plaintiff are not supported by the record, and her assessment of plaintiff's allegations is "patently wrong." *Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021); *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015).

---

[2]The ALJ also asserted that plaintiff alleged she had to elevate her legs each day, but that no doctor ever told her to do that. (R. 27). The ALJ gave no citation for this allegation, and the court was unable to locate it in the record. But, even assuming it was made, given the nap controversy, it is likely plaintiff said she elevated her legs to make them feel better and made no allegation that a doctor had told her to do so.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment [Dkt. #11] is granted; the defendant's motion for summary judgment [Dkt. #16] is denied, and this case is remanded to the Commissioner.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 4-5-22